**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAVELL REDMOND, | ) | |
|     Plaintiff, | ) | Case No.: 1:23-cv-05360 |
| v. | ) | |
| VILLAGE OF DOLTON, a municipal | ) | Judge: Mary M. Rowland |
| corporation; and TIFFANY HENYARD, in | ) | |
| her official capacity as Mayor of Dolton, | ) | |
|     Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT VILLAGE OF DOLTON'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lavell Redmond respectfully submits this Memorandum of Law in Opposition to Defendant Village of Dolton's Motion for Summary Judgment.

## INTRODUCTION

This case should proceed to trial because a reasonable jury could find that the Village of Dolton terminated Lavell Redmond in retaliation for speaking to Chicago Tribune / Daily Southtown columnist Ted Slowik about a matter of obvious public concern: whether then-Mayor Tiffany Henyard lied to the public, the press, and Village officials about her prior knowledge of Redmond's criminal background, and whether Redmond's Village employment was connected to campaign work and political loyalty. (Pl.'s SOAF ¶¶1–13.)

The Village attempts to recast the case as a purely personal employment dispute. But the record shows much more. Redmond's speech concerned a public official's truthfulness, the hiring of a registered sex offender into a municipal code-enforcement role, the use of public employment to reward campaign work, the Village's purported "Second Chance Program," and the public explanation given by Village officials in response to media scrutiny. Those topics are not merely personal. They are political, governmental, and public. (Pl.'s SOAF ¶¶7–13.)

1

The timing is also striking. Redmond spoke to Ted Slowik. Slowik reached out to Henyard for comment. Village Administrator Keith Freeman gave a same-day media statement announcing Redmond was "no longer employed." Redmond was terminated that same day. Freeman and Henyard then invoked the Fifth Amendment when asked about their communications, the media response, the truthfulness of the statement, and who made or approved the termination decision. That silence, combined with the independent record evidence, permits an adverse inference and precludes summary judgment. (Pl.'s SOAF ¶¶11–15, 23–32.)

At most, the Village identifies competing explanations for the termination: conviction record, public pressure, alleged workplace conduct, Redmond's speech to the media, or some combination of those. That is precisely why summary judgment must be denied. A jury must decide whether the Village's stated reason was true, pretextual, or only part of a retaliatory mixed-motive termination. (Pl.'s SOAF ¶¶14–22, 33–40.)

## RELEVANT FACTS

### A. Redmond worked on Henyard's campaign and was later hired by the Village.

Redmond met Tiffany Henyard during her campaign for Mayor of Dolton. He performed campaign work for her, including passing out campaign materials, and testified that he was not compensated for that campaign work. (Pl.'s SOAF ¶1.) During the campaign, Henyard discussed the possibility of Redmond working as part of her personal security detail. (Pl.'s SOAF ¶2.) After Henyard became Mayor, Redmond was hired by the Village as a Code Enforcement Officer. Redmond testified that Henyard was the person who called him in, helped him complete the application, walked him into Human Resources with Janice Johnson, and had him placed on payroll. (Pl.'s SOAF ¶5.) The Village's interrogatory answer identifying individuals involved in the decision to hire Redmond listed Tiffany Henyard and Dorothy Brown. (Pl.'s SOAF ¶6.)

Redmond also testified that Sammie Young informed Henyard of Redmond's criminal background and convictions during the campaign, and that Henyard knew about his background before hiring him. (Pl.'s SOAF ¶5.) That testimony is corroborated by the Affidavit of Sammie L. Young, Jr. Young states that, in or around March 2021, Henyard asked him about putting Redmond on her official security detail; that Redmond advised Henyard he was a convicted felon; that Young advised Henyard against hiring Redmond for law-enforcement/security-related work because it could create negative publicity; and that Henyard nevertheless insisted on hiring Redmond officially. (Pl.'s SOAF ¶¶3–4.)

### B. Redmond's employment became a public controversy.

Redmond's employment became the subject of public controversy and repeated media coverage because of his conviction record, registered sex offender status, Henyard's decision to hire him as a code enforcement officer, and questions about the Village's hiring practices and Henyard's truthfulness. FOX 32 covered the controversy in October and November 2021, including trustee and resident criticism, protests at Village Hall, and calls for Henyard's resignation. (Def.'s SOF ¶¶8, 24–27; Pl.'s SOAF ¶¶7–13.)

### C. Redmond spoke to Ted Slowik about Henyard's knowledge and alleged public dishonesty.

Redmond testified that on August 3, 2022, he spoke to Ted Slowik and told him that Henyard knew about his background and had been lying to the media by saying she did not know. (Pl.'s SOAF ¶8.) Redmond testified why his employment with the Village was terminated:

> "The main reason was because I went to the news on her. That was the main reason. Once I talked to Tom Slowik, that was a deal breaker for her. So she just — I guess the part where I told Tom Slowik that she knew about my background and she had been lying to the media saying she didn't know, I think that like really set her off and that was the — that was a deal breaker for her."

(Pl.'s SOAF ¶9.)

Redmond further testified that Slowik's article accurately summarized the information he provided, though Redmond had given more detail than was printed. (Pl.'s SOAF ¶10.)

### D. Slowik contacted Henyard for comment, and Freeman issued a same-day statement.

The August 3, 2022 Chicago Tribune / Daily Southtown article states that Slowik reached out to offer Henyard an opportunity to respond to Redmond's story. The article then quotes Village Administrator Keith Freeman as stating: "Mr. Redmond is no longer employed by the village of Dolton." (Pl.'s SOAF ¶12.) The article further attributes to Freeman the statement that "Mayor Henyard was unaware of his criminal background upon his initial hiring," and that the Village initially opted to include Redmond in a "Second Chance Program." (Pl.'s SOAF ¶12.) That statement directly responded to Redmond's protected speech: Redmond told Slowik that Henyard knew about his background and lied about it. Freeman's same-day statement denied that central claim and announced Redmond's termination. (Pl.'s SOAF ¶¶8–13.)

### E. Redmond was terminated on August 3, 2022.

Redmond was given a termination letter dated August 3, 2022. The letter states that he violated Section 2.2 of the Village of Dolton Employee Policy & Procedure Manual, "as well as inappropriate conduct against other employees," and that his employment was terminated effective immediately. (Pl.'s SOAF ¶14.) The letter does not identify the alleged inappropriate conduct. It does not identify any victim, witness, complaint, investigation, date, incident, or factual basis. It does not state that Redmond was terminated for taking photos, using binoculars, carrying a recording device, following Henyard, threatening Henyard, or any other specific factual conduct now emphasized by the Village in its summary judgment motion. (Pl.'s SOAF ¶¶12–15.)

### F. The Village's own witnesses failed to provide a non-retaliatory explanation.

Freeman testified that he was Village Administrator. He acknowledged the termination letter was addressed to Redmond and signed as coming from Keith Freeman, Village Administrator. But

Freeman testified he did not write the termination letter, that HR wrote it, that he understood HR to mean Janice Johnson, the head of Human Resources, but that he did not instruct Johnson to write it. Freeman also testified that he had no understanding of how the termination letter was drafted and that, to his knowledge, Johnson handled termination letters, but he was not aware that she was signing his name to those letters. (Pl.'s SOAF ¶¶20–22.)

Johnson likewise could not provide a factual basis for the termination. She testified that the stated reason for Redmond's termination was "per the letter" and that she did not know "what really the termination was all about." She also testified that she had no idea what the alleged Code of Conduct violation was, did not recall documented warnings or performance issues in Redmond's personnel record before termination, did not know whether Redmond had an opportunity to address or contest the reasons for his termination, and did not think there were documents beyond the termination letter outlining the reasons for or documenting the conduct that would be the stated basis for Redmond's termination. (Pl.'s SOAF ¶¶16–19.)

When Freeman was asked about communications with the media, whether he coordinated with Henyard about media responses, whether Henyard instructed him to make the statements reported in the article, whether he discussed the media coverage with Henyard, and whether he instructed employees not to speak to the media about Redmond, Freeman invoked the Fifth Amendment. (Pl.'s SOAF ¶¶23–27.)

Henyard likewise invoked the Fifth Amendment when asked whether she had discussions with Village officials about Redmond's criminal background, whether she was aware of his criminal history before hiring him, whether she was aware of FOX 32 reporting on Redmond's employment, whether she communicated with reporters or media outlets about Redmond, whether she instructed anyone in the Village to respond to media inquiries, whether she wrote, approved, reviewed, or edited Freeman's public statement, whether the statement was accurate, who made the decision to terminate Redmond,

whether she approved or directed that decision, whether she discussed how Redmond's termination might affect her public image, whether she or anyone acting on her behalf instructed Redmond not to speak to the media, and whether she told anyone that Redmond's media appearances or comments embarrassed her administration. (Pl.'s SOAF ¶¶28–32.)

Those invocations are highly probative. The very people who allegedly knew why Redmond was fired refused to answer the most central questions. (Pl.'s SOAF ¶¶23–32.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "A genuine issue of material fact exists if `the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[S]peculation is not sufficient to survive summary judgment," *Piotrowski v. Menard, Inc.,* 842 F.3d 1035, 1039 (7th Cir. 2016); "there must be evidence," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ARGUMENT

### I.   DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS.

To establish a First Amendment retaliation claim, a public employee must show that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter future

6

protected speech; and (3) his protected speech was at least a motivating factor in the employer's adverse action. *See, e.g., Kidwell v. Eisenhauer*, 679 F.3d 957, 964–65 (7th Cir. 2012); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 500–01 (7th Cir. 2010). A public employee's speech is protected if he spoke as a citizen on a matter of public concern and the employee's interest in speaking is not outweighed by the government employer's interest in efficient operations. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968); *Connick v. Myers,* 461 U.S. 138 (1983). Whether speech addresses a matter of public concern is evaluated by content, form, and context. *Connick*, 461 U.S. at 147–48.

Importantly, an employee's personal motive does not defeat First Amendment protection where the speech also addresses a matter of public concern. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 795 (7th Cir. 2016); *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002). Speech exposing potential misconduct by public officials, political favoritism, misuse of government authority, or dishonesty in government generally implicates public concern. Further, in civil cases, the Fifth Amendment does not prohibit adverse inferences from a party's refusal to answer probative questions. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389–91 (7th Cir. 1995). The inference is permissive, not mandatory, and should be considered along with other evidence. *Harris v. City of Chicago*, 266 F.3d 750, 753–54 (7th Cir. 2001).

## A. Redmond's speech addressed a matter of public concern.

The Village's first argument fails because Redmond's speech was plainly about a matter of public concern. Redmond did not merely complain about his job. He spoke to a newspaper columnist about the Mayor of Dolton's alleged dishonesty in responding to a public controversy over the hiring of a registered sex offender into a Village code-enforcement position. (Pl.'s SOAF ¶¶7–13.) The content of the speech involved whether Henyard knew Redmond's criminal background before hiring him; whether Henyard lied to the media and Village officials when she said she did not know; whether

7

Redmond's hiring was connected to campaign work or political loyalty; whether the Village actually had a "Second Chance Program" or used that phrase as a *post hoc* justification; and whether the Village's hiring and background-check practices were being truthfully explained to the public. (Pl.'s SOAF ¶¶1–13.)

These issues concern public integrity, public employment, public safety, municipal hiring practices, political favoritism, and the honesty of an elected official—all classic matters of public concern. *See Connick*, 461 U.S. at 146–48 (speech involves public concern when it relates to political, social, or other concern to the community, including breach of public trust); *Kristofek*, 832 F.3d at 795–96  (speech concerning political favoritism and official misconduct was public concern); *Spiegla v. Hull*, 371 F.3d 928, 937–39 (7th Cir. 2004) (speech exposing public-employee misconduct, malfeasance, and public-safety concerns was public concern); *Gustafson*, 290 F.3d at 907–08 (content is the most important factor, and personal motive does not defeat public concern where the speech also seeks to bring public consequences to light).

The form and context reinforce that conclusion: Redmond spoke to a member of the press about an issue that had already generated public controversy, media coverage, trustee criticism, resident protests, and calls for transparency. (Pl.'s SOAF ¶¶7–13.) This was not an internal workplace grievance sent only to HR; it was speech to the media about the conduct of an elected official and the Village's public explanation of a controversial hiring decision. *See Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 941–42 (7th Cir. 2004) (speech concerning local government conduct and democratic accountability was public concern, even where some issues were already publicly known).

The Village emphasizes that Redmond had personal reasons for speaking. That does not decide the issue. The Seventh Circuit has repeatedly held that personal motivation does not eliminate First Amendment protection where the speech itself concerns public issues. In *Kristofek*, the Seventh Circuit rejected the argument that self-interest defeats public concern, explaining that motive is

8

relevant but not dispositive. *Kristofek*, 832 F.3d at 793. Here, even if Redmond had personal reasons to defend himself, the content of his speech exposed alleged dishonesty by a public official in connection with a public controversy. (Pl.'s SOAF ¶¶7–13.) The Village's reliance on cases involving purely personal grievances is misplaced. Redmond's speech was not limited to "I was treated unfairly." His speech was: the Mayor knew about my background, used my campaign work, hired me, then lied publicly about her knowledge when it became politically damaging. That is a public concern. (Pl.'s SOAF ¶¶1–13.)

### B. A reasonable jury could find that the Village knew about Redmond's protected speech before terminating him.

The Village next argues that Redmond cannot prove knowledge. That argument ignores the circumstantial evidence and the reasonable inferences that must be drawn in Plaintiff's favor. Chronology alone creates a jury issue. On August 2, 2022, Redmond spoke to Ted Slowik. (Def. Ex. B, Redmond Dep. 146:7–13.) The next day, on August 3, 2022, Slowik contacted Henyard for comment. That same day, Freeman issued a statement to Slowik announcing that Redmond was no longer employed and denying Redmond's core allegation that Henyard knew about his background. Redmond was terminated the same day on August 3, 2022. (Pl.'s SOAF ¶¶8–15.)

The Village characterizes Slowik's article as inadmissible hearsay. But Plaintiff does not offer the article merely for the truth of every factual assertion in it. The article is admissible, or at minimum reducible to admissible form at trial, to show notice, effect on the listener, timing, and the fact that the Village responded to Slowik's inquiry. Freeman's quoted statement is also independently admissible as a statement by the Village Administrator concerning Village business under Fed. R. Evid. 801(d)(2). (Pl.'s SOAF ¶¶11–13, 23–27.)

Moreover, Freeman did not testify that Slowik fabricated the quote. He testified that he frequently dealt with the press for the Village during 2022. When asked whether he would coordinate with Henyard about how to respond to reporters, whether Henyard instructed him to make the

9

statements in the article, whether he and Henyard discussed how to respond to media coverage regarding Redmond, and whether he instructed Village employees not to speak to the media about Redmond, Freeman invoked the Fifth Amendment. (Pl.'s SOAF ¶¶23–27.)

Henyard invoked the Fifth Amendment when asked whether she communicated with media outlets, instructed anyone to respond to media inquiries, approved Freeman's public statement, reviewed or edited it, knew whether it was accurate, made or approved the termination decision, and discussed how Redmond's termination might affect her public image. (Pl.'s SOAF ¶¶28–32.)

A jury may consider those invocations together with the same-day article, the same-day termination, Freeman's public statement, and Redmond's testimony. The Village's "no knowledge" argument therefore fails. (Pl.'s SOAF ¶¶8–15, 23–32.)

### C. A reasonable jury could find causation and retaliatory motive.

The evidence of causation is sufficient to defeat summary judgment. First, the timing is unusually close. The record supports an inference that Redmond spoke to Slowik, Slowik contacted Henyard for comment, Freeman responded to the media, and Redmond was terminated the same day. Temporal proximity this tight is probative, especially where the adverse action follows immediately after the employer learns of the protected speech. (Pl.'s SOAF ¶¶8–15.) *See Lalvani v. Cook County,* 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied."); *Kidwell v. Eisenhauer,* 679 F.3d 957, 966 (7th Cir. 2012) (suspicious timing generally requires an adverse action that follows "close on the heels" of protected expression. […] "no more than a few days"). Here, the timing is not merely close; it is effectively immediate and is reinforced by Freeman's same-day public statement, the vague termination letter, and Henyard's and Freeman's Fifth Amendment invocations. (Pl.'s SOAF ¶¶8–15, 23–32.)

Second, the Village's public statement confirms that the Village was responding to the precise subject matter of Redmond's speech. Redmond told Slowik that Henyard knew about his criminal background and lied about it. Freeman's same-day statement said Henyard was unaware of Redmond's background when he was hired. That is not coincidental. It is a direct response to Redmond's speech. (Pl.'s SOAF ¶¶8–13.)

Third, the Village's stated reason is vague, unsupported, and disputed. The termination letter cites "Section 2.2" and "inappropriate conduct against other employees," but identifies no complainant, incident, investigation, date, witness, or factual basis, and it does not mention the conduct the Village now emphasizes in its motion, including binoculars, a recording device, a photograph, following anyone, harassment, intimidation, or threatening conduct. (Pl.'s SOAF ¶¶14–15.) That absence matters because the Village's own Human Resources witness, Janice Johnson, could not supply the missing basis. Johnson testified that she did not know "what really the termination was all about," had no idea what the alleged Code of Conduct violation was, did not recall prior warnings or performance issues in Redmond's personnel record, and did not think there were documents beyond the termination letter documenting the basis for termination. (Pl.'s SOAF ¶¶16–19.)

Freeman's name appears on the termination letter, but he testified that he did not draft it, did not instruct Johnson to draft it, and had no understanding of how it was prepared. (Pl.'s SOAF ¶¶20–22.) Henyard then refused to answer whether she approved or directed the termination, while Freeman invoked the Fifth Amendment regarding his communications with Henyard and the media concerning Redmond. (Pl.'s SOAF ¶¶23–32.) A jury may treat shifting or inconsistent explanations as evidence of pretext. *See Silverman v. Bd. of Educ. of City of Chicago,* 637 F.3d 729, 743–44 (7th Cir. 2011); *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).

At minimum, the suspicious timing, public-media response, vague termination letter, lack of supporting documentation, the Village HR witness's inability to explain the termination, and the Fifth

Amendment invocations create a triable issue as to whether Redmond's protected speech was a motivating factor in his termination. (Pl.'s SOAF ¶¶8–32, 35–40.)

### D. The IDHR Charge and Fox lawsuit do not eliminate the First Amendment claim.

The Village places heavy weight on Redmond's IDHR charge and later lawsuit against Fox, but neither defeats this case. A First Amendment plaintiff need not prove that protected speech was the only cause of the adverse action; he must show that it was a substantial or motivating factor. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Kidwell*, 679 F.3d at 965. Thus, Redmond's position that public pressure, conviction-record discrimination, Fox coverage, and retaliation for his protected speech all contributed to his termination does not defeat his claim.

Those theories are not inconsistent. Redmond has consistently maintained that his termination was tied to the public controversy over his conviction record and Henyard's handling of that controversy. His protected speech concerned that same controversy: Henyard's alleged prior knowledge of his conviction record and her alleged public dishonesty about it. (Pl.'s SOAF ¶¶7–13.) The IDHR charge alleged that Redmond was discharged "due to conviction record," but that administrative charge does not operate as a judicial admission eliminating all other claims or motives. At most, it is evidence for the jury to weigh. It can coexist with Redmond's claim that Henyard terminated him because he publicly exposed her alleged knowledge and lies about that same conviction record. (Def.'s SOF ¶¶29–35; Pl.'s SOAF ¶¶7–13.)

The Fox lawsuit is no different. That lawsuit concerned media coverage that contributed to the public controversy surrounding Redmond's employment. It does not negate Redmond's sworn testimony in this case that the immediate "deal breaker" was his decision to speak to Slowik about Henyard's knowledge and public statements. (Def.'s SOF ¶¶37–40; Pl.'s SOAF ¶¶8–13.) At most, the Village has identified multiple possible pressures or motives, which is not a basis for summary

12

judgment. If protected speech was a motivating factor, the burden shifts to the Village to prove it would have made the same decision anyway. On this record, that is a jury question.

### E. The Village's hearsay argument does not warrant summary judgment.

Village's attempt to exclude the Slowik article wholesale fails. At summary judgment, evidence need not be presented in admissible form so long as it can be reduced to admissible evidence at trial. Fed. R. Civ. P. 56(c)(2); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). Here, Slowik can testify regarding his communications with Redmond, his outreach to Henyard, and the Village's response; Freeman can be examined regarding his statement; and Henyard can be examined or, if she maintains her invocation, Plaintiff can seek appropriate inferences. (Pl.'s SOAF ¶¶8–13, 23–32.) In any event, the article is not offered solely for the truth of every statement in it. It is offered to show notice, timing, effect on the listener, and that the Village responded to the precise subject of Redmond's protected speech immediately before or contemporaneously with his termination, which is not hearsay. *Backwater, Inc. v. Penn-Am. Ins. Co.,* 448 F.3d 962, 965 (7th Cir. 2006); *United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002).

Freeman's quoted statement is also admissible against the Village as a statement by its Village Administrator concerning Village employment and official Village business. Fed. R. Evid. 801(d)(2)(D); *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761–62 (7th Cir. 2003). Nor can the Village show prejudice from Slowik not being separately listed by name in Plaintiff's Rule 26(a)(1) disclosures, because Plaintiff's Complaint placed Slowik and the Chicago Tribune at the center of the case, the Village itself relied on the Slowik article, and Plaintiff's disclosures identified categories broad enough to encompass witnesses identified in produced documents and witnesses necessary to authenticate documents. (Pl.'s Resp. to Def.'s SOF ¶28; Pl.'s SOAF ¶¶11–13.)

### F. Henyard and Freeman's Fifth Amendment invocations support denial of summary judgment.

The Village acknowledges that Henyard and Freeman invoked the Fifth Amendment during their depositions but then asks the Court to ignore the logical consequences of those invocations. In civil cases, adverse inferences may be drawn from a party's refusal to testify in response to probative evidence. The inference alone may not establish liability, but Plaintiff does not rely on silence alone. Plaintiff relies on Redmond's testimony, Young's affidavit, the same-day media article and Freeman statement, the same-day termination letter, Freeman's limited testimony, the vague and unsupported termination rationale, and the Fifth Amendment invocations. (Pl.'s SOAF ¶¶1–40.)

The questions Henyard and Freeman refused to answer went to the heart of the case. Freeman refused to answer whether he coordinated with Henyard about media responses, whether she instructed him to make the public statement, whether he discussed media coverage with her, and whether he told employees not to speak to the media. (Pl.'s SOAF ¶¶23–27.) Henyard refused to answer whether she knew Redmond's background, approved the public statement, reviewed or edited it, made or approved the termination decision, discussed the termination's impact on her public image, or told anyone that Redmond's media appearances or comments embarrassed her administration. (Pl.'s SOAF ¶¶28–32.) Those invocations, considered with the independent evidence, create a genuine dispute of material fact. (Pl.'s SOAF ¶¶1–40.)

### G. Municipal liability exists because the challenged action was taken by final policymakers or their delegated decisionmakers.

The Village is not entitled to summary judgment on municipal-liability grounds because a single unconstitutional decision by an official with final policymaking authority can establish liability under § 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675–76 (7th Cir. 2009). Final policymaking authority may be direct, delegated, or ratified by an official with such authority. *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737–39 (7th Cir. 1999).

14

Here, Henyard was the Mayor and chief executive officer, and the Village's own manual provides that the Mayor may terminate employees when she believes the Village's interests require termination. Freeman was the Village Administrator, signed the termination letter, served as the Village's public voice in the same-day media statement, and Defendant's interrogatory answer states that Henyard, Freeman, and Thigpen participated in the termination decision, with Freeman making the final decision. Henyard then refused to answer whether she approved or directed the termination, while Freeman invoked the Fifth Amendment on core questions concerning his communications with Henyard and media responses regarding Redmond. At minimum, this record creates a triable issue as to whether the termination was directed, approved, ratified, or carried out by final policymakers or delegated decisionmakers for the Village. (Pl.'s SOAF ¶¶12, 20–23, 28–35.)

## CONCLUSION

The Village's motion depends on drawing inferences against Redmond. That is improper at summary judgment. The record supports a reasonable finding that Redmond spoke as a private citizen to the press about a matter of public concern; that Henyard and Freeman knew of that speech; that the Village responded to the speech through Freeman's media statement; that Redmond was terminated the same day; that the stated reason was vague and unsupported; and that Henyard and Freeman invoked the Fifth Amendment when asked the key questions that would confirm or deny retaliatory motive. (Pl.'s SOAF ¶¶1–40.) For these reasons, Plaintiff respectfully requests that the Court deny Defendant Village of Dolton's Motion for Summary Judgment.

Respectfully submitted,

By:  /s/ Matthew R. Custardo
One of LAVELL REDMOND's Attorneys

Matthew R. Custardo (ARDC #: 06329579)
CUSTARDO LAW, LLC
650 Warrenville Road, Suite 100, Lisle, IL 60532
Tel: 630-557-1451
matthew@custardolaw.com

15

## CERTIFICATE SERVICE

The undersigned attorney hereby certifies that on July 1, 2026, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Chicago, Illinois, by using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this matter, as shown below:

*Michael J. McGrath*
*Odelson, Murphey, Frazier & McGrath, Ltd.*
*3318 W. 95th Street*
*Evergreen Park, IL 60805*
**Attorneys for the Village of Dolton**

*Thomas More Leinenweber*
*Michael J. Schalka*
*LEINENWEBER DAFFADA &*
*SANSONETTI, LLC*
*120 North LaSalle Street, Suite 2000*
*Chicago, IL 60602*
*Phone: 312-606-8705*
*thomas@ilesq.com*
*mjs@ilesq.com*
**Attorneys for Tiffany Henyard**

and I certify that I have mailed same via the United States Postal Service to the following non-CM/ECF participants:

/s/  Matthew R. Custardo

CUSTARDO LAW, LLC
Matthew R. Custardo (ARDC #: 06329579)
650 Warrenville Road, Suite 100
Lisle, IL 60532
Tel: 630-557-1451
matthew@custardolaw.com

16